# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>The Apple iPhone 7 Plus, serial number F2LSJM6HHFY6, seized from the person of Arthit TANJAPATKUL on October 13, 2023, which is in the custody of the FBI as Item No. 1B113 in Case No. 52B-LA-3628665 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 2:24-mj-04248 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o) | Unlawful Possession of a Machinegun |
| 18 U.S.C. § 933 | Trafficking Firearms |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Daniel Dales
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  __July 17, 2024__

_____
*Judge's signature*

City and state:  __Los Angeles, CA__

Steve Kim, U.S.M.J.
_____
*Printed name and title*

AUSA: Kedar S. Bhatia (x4442)

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

    The Apple iPhone 7 Plus, serial number F2LSJM6HHFY6, seized from the person of Arthit TANJAPATKUL on October 13, 2023 (the "SUBJECT CELLPHONE"). The SUBJECT CELLPHONE is currently in the custody of the Federal Bureau of Investigation ("FBI") in Long Beach, California, and is identified as Item No. 1B113 in Case No. 52B-LA-3628665.

## ATTACHMENT B-2

I.   **ITEMS TO BE SEIZED**

1.   All information that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(o) (Unlawful Possession of a Machinegun) and 18 U.S.C. § 933 (Trafficking Firearms) (the "SUBJECT OFFENSES") from January 1, 2014, to the date of this Warrant, namely:

a.   Records regarding the actual or attempted possession of a firearm, component part, or accessory.

b.   Records regarding the sale, advertising, or attempted sale or advertising of a firearm, component part, or accessory.

c.   With respect to the SUBJECT CELLPHONE, the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

2

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR THE SUBJECT CELLPHONE

4.   In searching the SUBJECT CELLPHONE or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the SUBJECT CELLPHONE on-site or seize and transport the SUBJECT CELLPHONE and/or forensic image(s) thereof to an appropriate law enforcement laboratory or

similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the SUBJECT CELLPHONE and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   In searching the contents of the SUBJECT CELLPHONE, law enforcement officers may search previously generated electronic forensic copies of the same device.

c.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in SUBJECT CELLPHONE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT CELLPHONE and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

d.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

e.    If the search determines that the SUBJECT CELLPHONE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

f.    If the search determines that the SUBJECT CELLPHONE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g.    If the search determines that the SUBJECT CELLPHONE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the SUBJECT CELLPHONE and any forensic copies of the SUBJECT CELLPHONE, but may not access data falling outside the scope of the other items to be seized (after the

5

time for searching the device has expired) absent further court order.

h.   The government may also retain the SUBJECT CELLPHONE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search the SUBJECT CELLPHONE because the device or files contained therein is/are encrypted.

i.   After the completion of the search of the SUBJECT CELLPHONE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   The special procedures relating to the SUBJECT CELLPHONE found in this warrant govern only the search of the

SUBJECT CELLPHONE pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Daniel Dales, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2017. I am currently assigned to the Federal Bureau of Investigation ("FBI") Los Angeles Field Office Long Beach Resident Agency Domestic Terrorism Squad, which investigates residents of the United States who use force or violence in furtherance of a political and/or social agenda in violation of federal law. As an FBI Special Agent, I have received both formal and informal training from the FBI and other institutions regarding electronic communications and the use of the internet and digital devices in furtherance of domestic terrorism crimes. I have also participated in numerous investigations involving subjects who use the internet and electronic communications to research and facilitate those crimes, including through obtaining and executing search warrants.

### II.   **PURPOSE OF AFFIDAVIT**

2.   This affidavit is made in support of search warrants for (i) the storage unit Space 2022 at Public Storage, 4501 West MacArthur Boulevard, Santa Ana, California 92704, described in Attachment A-1 (the "SUBJECT STORAGE UNIT"), (ii) the Apple

iPhone 7 Plus, serial number F2LSJM6HHFY6, seized from Arthit TANJAPATKUL ("TANJAPATKUL") on October 13, 2023, held in the custody of the FBI as Item No. 1B113 in Case No. 52B-LA-3628665 (the "SUBJECT CELLPHONE"), described in Attachment A-2, (iii) the Buffalo External Hard Drive seized from TANJAPATKUL on October 13, 2023, held in the custody of the FBI as Item No. 1B161 in Case No. 52B-LA-3628665 (the "SUBJECT HARD DRIVE"), described in Attachment A-3, for the items to be seized described in Attachments B-1, B-2, and B-3, which are the evidence, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 2314 (Transportation of Stolen Goods), 18 U.S.C. § 641 (Sale of Government Property), 18 U.S.C. § 371 (Conspiracy to Defraud the Food and Drug Administration), 18 U.S.C. § 922(o) (Unlawful Possession of a Machinegun), 18 U.S.C. § 933 (Trafficking Firearms), 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography), and 18 U.S.C. § 2252A(a)(2) (Receipt and Distribution of Child Pornography) (the "SUBJECT OFFENSES").[1]

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

---

[1] As set forth herein and in Attachments B-1, B-2, and B-3, the proposed warrants will allow officers to search for evidence of different subsets of the Subject Offenses depending on the premises or device being searched.

is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III.   <u>SUMMARY OF PROBABLE CAUSE</u>

4.   In March 2023, TANJAPATKUL used his cell phone and a Facebook account to sell a stolen LA-5/PEQ laser aiming system to a civilian. This laser is regulated by the Food and Drug Administration ("FDA") and may only be sold directly to law enforcement or government agencies. TANJAPATKUL left his home in Santa Ana, California, to ship the device to a buyer in West Virginia. At the time of the sale, the United States Army had identified the laser as stolen based on its serial number. Between July 2014 and April 2019, TANJAPATKUL sent approximately $277,000 to an Army Property Book Officer who was later convicted for stealing approximately $2,000,000 in property from the military. Through October 2023, TANJAPATKUL continued to sell laser aiming sights online.

5.   On or about June 30, 2023, the Honorable Charles Eick, United States Magistrate Judge, authorized a warrant for agents to search a Facebook account in the name of "Taro Kosit," which was used by TANJAPATKUL, for evidence, fruits, or

instrumentalities of violations of 18 U.S.C. §§ 371, 641, and 2314.

6.    On or about October 6, 2023, the Honorable A. Joel Richlin, United States Magistrate Judge, authorized warrants for agents to search the residence, vehicle and person of TANJAPATKUL for evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371, 641, and 2314.

7.    With this affidavit, I am seeking warrants to search (i) the SUBJECT STORAGE UNIT, a storage space utilized by TANJAPATKUL to store contraband that he sold on the internet; (ii) the SUBJECT CELLPHONE, which was seized from TANJAPATKUL's person and searched pursuant to a prior warrant, on which officers observed communications and images in plain view that show TANJAPATKUL's possession of a machinegun and discussion about a machinegun sale; and (iii) the SUBJECT HARD DRIVE, which was seized from TANJAPATKUL's home, on which officers observed child pornography in plain view while searching the device pursuant to one of the prior search warrants.

8.    Regarding the SUBJECT STORAGE UNIT, as set forth below, a review of digital devices seized from TANJAPATKUL shows that as recently as October 2023, just prior to officers' search of TANJAPATKUL's home, he was selling prohibited items and made repeated references to picking up items or checking for items in his storage unit. TANJAPATKUL has continued to pay for the

4

costly storage unit, including making a payment as recently as on or about June 19, 2024.

9.    Regarding the SUBJECT CELLPHONE, as set forth below, agents seized the cellphone from TANJAPATKUL's person in October 2023 pursuant to a search warrant authorized by Judge Richlin. While reviewing the contents of the hard drive for evidence of the fraud offenses (as authorized by the warrant), officers observed messages and a photograph on the device in which TANJAPATKUL discussed owning a machinegun and, separately, discussed buying one. When officers searched TANJAPATKUL's home pursuant to another warrant issued by Judge Richlin, they seized three machineguns, including one that appeared to be same one shown in the messages and photograph on TANJAPATKUL's cellphone. Because the prior warrant that authorized the seizure and search of TANJAPATKUL's cellphone may not have authorized the seizure of messages about TANJAPATKUL's unlawful possession of a machinegun, the proposed warrant I am seeking now will permit the search for and seizure of messages on TANJAPATKUL's cellphone about unlawful possession of a machinegun.

10.    Regarding the SUBJECT HARD DRIVE, as set forth below, agents seized the hard drive from TANJAPATKUL's house in October 2023 pursuant to the search warrant authorized by Judge Richlin. While reviewing the contents of the hard drive for evidence of the fraud offenses, officers observed child pornography in plain

view. File names for the material referenced the under-age
nature of the persons depicted, with names including "Daphne
9yo" (i.e., 9 years old) and "Nude 12y" (i.e., 12 years old).
Because the prior warrant that authorized the seizure and search
of the hard drive may not have authorized the seizure of
messages about child pornography, the proposed warrant I am
seeking now will permit the search for and seizure of child
pornography on the hard drive.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.   Background on FDA-Regulated Laser Aiming Sights**

11.   Based on my review of law enforcement reports and
conversations with others, including information provided to the
FBI by FDA Special Agent Wilmer Smithson, I know that the FDA
has regulatory authority of lasers in the United States. The FDA
restricts the output power of visible lasers that can be sold to
civilians to no more than 5 milliwatts ("mW"). The FDA regulates
infrared lasers because these lasers are invisible, thus not
causing a blink reflex, which may cause serious eye injury.
Infrared lasers are restricted and cannot be sold to civilians.
The lasers identified in this affidavit are high-powered miliary
laser aiming systems used to provide precise aiming of weapons
during day and night operations. The LA-5B/PEQ laser is a higher
power variant of the AN/PEQ-15 laser. The LA-5B/PEQ laser
provides enhanced performance under direct sunlight and the

higher power infrared illuminator allows users to reach out to much greater distances, using the illuminator as a pointer.

**B.   TANJAPATKUL Sells a Stolen LA-5/PEQ Laser in March 2023**

18.   In February and March 2023, an FBI confidential human source (the "CHS")[2] communicated with TANJAPATKUL via Facebook Messenger to negotiate a sale of an LA-5/PEQ laser. The CHS provided the FBI with those communications. I have reviewed the communications and learned that in substance and summary, TANJAPATKUL and the CHS had the following exchanges:

a.   On February 15, 2023, TANJAPATKUL told the CHS that he "might have" a few AN/PEQ-15 lasers and LA-5/PEQ lasers. According to the CHS, based on prior conversations, the CHS believed TANJAPATKUL meant that he had AN/PEQ-15 lasers and LA-5/PEQ lasers for sale.

b.   On March 7, 2023, the CHS messaged TANJAPATKUL expressing interest in a AN/PEQ-15 laser or a LA-5/PEQ laser. TANJAPATKUL responded that he had an LA-5/PEQ laser available and sent a photograph of a tan laser aiming device with serial number 310958. The photograph TANJAPATKUL sent, using Facebook Messenger, is below:

---

[2] The CHS is receiving payment and has received immigration benefits from the FBI. The FBI has corroborated the CHS's reporting on multiple occasions and has found the CHS to be reliable and credible. Based on my communication with other law enforcement officers, I have learned that the CHS has a prior narcotics possession conviction in a foreign county.



The device displayed a danger label which indicated that its visible laser output power was 25 mW and its infrared output power was 100 mW, meaning that the laser was regulated by the FDA. TANJAPATKUL offered the laser for $3,250 with shipping included. TANJAPATKUL stated the laser was from his personal collection and was better than what he had seen in the past six months. TANJAPATKUL told the CHS that he had another interested buyer. TANJAPATKUL told the CHS if he/she was not interested in the laser, TANJAPATKUL would put it back in his safe. TANJAPATKUL also told the CHS that this LA-5/PEQ laser was in great condition and had not been used. He stated the serial number on the body matched the label, which was in good condition. TANJAPATKUL told the CHS this LA-5/PEQ was not like other cheap units had had seen online.

19. According to the CHS and text messages I have reviewed, on March 8, 2023, TANJAPATKUL, using a particular

8

telephone number ending in 0306 (the "0306 Phone Number"),[3] provided the CHS with his bank account and routing information so that the CHS could send him a wire transfer. TANJAPATKUL provided his name "Arthit Tanjapatkul" or "A Tan" and his address 3494 Aries Court in Santa Ana, California (the "TANJAPATKUL Residence"). The FBI directed the CHS to send TANJAPATKUL a wire transfer for $3,250. TANJAPATKUL confirmed receipt of the payment and told the CHS that he would send the laser. TANJAPATKUL also sent a photograph of the laser which appeared to match the first photograph he sent the CHS which showed serial number 310958. That photograph is below:

---

[3] According to a U.S. Customs and Border Protection ("CBP") report, TANJAPATKUL provided the same telephone number to CBP during an interview when he entered the United States on November 8, 2022. On April 19, 2023 I received Verizon subscriber information for the 0306 Phone Number. Verizon associated the 0306 Phone Number with Cherry TANJAPATKUL of the TANJAPATKUL Residence. Additionally, I interviewed TANJAPATKUL on October 13, 2023 and TANJAPATKUL told me that the 0306 Phone Number was his telephone number.



20. On March 8, 2023, during the above referenced
conversation, I conducted physical surveillance at the
TANJAPATKUL Residence. Based on my communication with other law
enforcement agents, I know that at approximately 3:54 PM PST,
TANJAPATKUL told the CHS that he had received the money and
would be shipping the laser on that date. At approximately 4:17
PM, I observed TANJAPATKUL exit the TANJAPATKUL Residence with
a small, white United States Postal Service ("USPS") box and
drive to the USPS located at 3101 West Sunflower Avenue, Santa
Ana, California in his vehicle. I also know, through
communication with other law enforcement agents, that
TANJAPATKUL passed that box over the counter for shipment at
that USPS. I received the below photograph from FBI Task Force
Officer Jeffrey Shanaphy, who watched TANJAPATKUL pass this box
for shipment.

10



According to communications provided by the CHS which I have
reviewed, TANJAPATKUL then messaged the CHS "Done. Now just a
waiting game" with a photograph of a USPS transaction receipt,
registered mail receipt, and white USPS Priority Mailbox, as
depicted below:



21.  Based on my communications with other law enforcement agents and review of law enforcement reports, I know that on or before March 17, 2023, the CHS, who resides in West Virginia, received a USPS package from return address "A. Tanjapatkul 3494 Aries Court, Santa Ana, CA 92704." Special Agent Michael McDonald opened the package and seized a tan colored LA-5/PEQ laser bearing serial number 310958. That item is now in the custody of the FBI.

**C.   The LA-5/PEQ Laser (serial number 310958) is Stolen U.S. Army Property**

22.  Based on my conversation with Defense Criminal Investigative Service ("DCIS") Special Agent Eric Braun, and my review of U.S. Army property records, I know that the LA-5/PEQ laser (serial number 310958) was stolen military property at the

time TANJAPATKUL possessed and sold it to the CHS on March 8, 2023.

23.   Based on review of law enforcement reports, open-source research, and communications with DCIS Special Agent Eric Braun, I know that U.S. Army Chief Warrant Officer 2 Bryan Allen ("Allen") was a property book officer for the U.S. Army in Fort Bragg, North Carolina in 2017 and 2018. During an August 2019 interview with Homeland Security Investigations ("HSI") Special Agents, Allen admitted to stealing equipment from his battalion, deleting the records of that equipment from the property books, and selling the equipment for personal profit. Allen stole an estimated $2,000,000 worth of U.S. Army property. Allen was federally indicted and in January 2020 pleaded guilty to one count of 18 U.S.C. § 641 and one count of 18 U.S.C. § 1025A(a)(1). Much of the stolen property has not been recovered.

24.   Based on my review of law enforcement reports and U.S. Army property records, I know that on April 10, 2017, Allen deleted LA-5/PEQ laser (serial number 310958) from the property records. This act is consistent with his overall scheme to take military property and then delete the record of that item in property records, making it harder to detect his fraud.

**D.   Between July 2015 and April 2019, TANJAPATKUL Sent Approximately $277,000 to Allen**

25.   Based on my review of law enforcement reports and conversations with other law enforcement agents, I know that TANJAPATKUL's PayPal records reflect approximately 150 payments to Allen, totaling approximately $277,000, between July 2015 and April 2019.

**E.   Additional Evidence of Online Laser Sales**

26.   In April 2023, I received subscriber information from Paypal Inc. for PayPal and Venmo accounts associated with TANJAPATKUL. I reviewed Venmo account records subscribed to by A Tan at the TANJAPATKUL Residence. I know based on my knowledge of TANJAPATKUL's nickname "A Tan" and TANJAPATKUL's home address, that this is likely TANJAPATKUL's Venmo account. Based on my review of the activity on this Venmo account, combined with the items seized from Tanjapatkul's residence in October 2023, I believe TANJAPATKUL was continuing to sell lasers online through approximately October 2023.

27.   According to the Venmo and PayPal records, I learned the following:

a.   In June 2022, TANJAPATKUL received three payments from Carl Johnson, cjjohnsonb4@gmail.com, for $1, $1, and $2,034. The subject of one of these transactions was "test for cat toys." Based on my training and experience, I know that

lasers are commonly used as cat toys and this subject line is likely a cover for the $2,034 payment for a high powered laser similar to the one TANJAPATKUL sold on March 8, 2023.

      b.   In June 2022, TANJAPATKUL received one payment for $3,038 from Roland Castro, rolandcastro@gmail.com. The subject showed two "thumbs up" emojis. This payment is similar to the amount paid for the laser TANJAPATKUL sold on March 8, 2023.

      c.   In June 2022, TANJAPATKUL received one payment for $1,376 from Jonathan Dinning, littlejd826@aol.com. Again, the subject line referenced "cat toy."

      d.   In July 2022, TANJAPATKUL received one payment for $2,070 from Joshua Wireman ("Wireman"), joshgwireman@outlook.com, with the subject "Food." A second payment for $40 was sent with the subject "The rest." Based on review of law enforcement reports, I know that Wireman was the subject of a 2021 FBI investigation when Wireman at one time was believed to be recruiting individuals who would dress in full tactical gear and train to engage in violent confrontations in violation of Federal Law.

      e.   In August 2022, Tyler Clark attempted two payments to TANJAPATKUL for $2,035 with the subject "Thanks Man!" but the payments were "RISK_DECLINED."

**F.    TANJAPATKUL Uses Facebook account Taro Kosit to Sell Lasers**

28.   In April 2023, I received subscriber information from for the Facebook account with vanity name "Taro Kosit". The subscriber was Taro Kosit and the associated email addresses were zemperfi@live.com and taro.kosit@facbook.com. I know TANJAPATKUL is the user of this account because TANJAPATKUL communicated via Facebook messenger on this account to sell an LA-5/PEQ laser to the CHS on March 8, 2023. Specifically, to complete the sale, TANJAPATKUL provided a screenshot of his Venmo QR code in the with username A Tan, @ATanja. Based on my review of Venmo subscriber information provided by PayPal Inc. in April 2023, I know that TANJAPATKUL is the subscriber of Venmo account @ATanja. The CHS started this transaction via Facebook Messenger, but later it was moved to the 0306 Phone Number to complete shipping and payment details.

29.   On June 30, 2023, Judge Eick authorized a warrant to search the Facebook account with vanity name "Taro Kosit" for evidence of violations of the SUBJECT OFFENSES. See 2:23-mj-3314 (C.D. Cal.). I reviewed the returns and learned the following:

a.   Many of the messages contained discussions about the sale of law enforcement and military equipment, including LA-5/PEQ lasers.

b.   On May 29, 2023, during a conversation with a Facebook Messenger user who expressed interest in buying lasers from TANJAPATKUL, TANJAPATKUL posted the following pictures:

 

c.   During that same exchange, TANJAPATKUL responded to a query about the age of the lasers TANJAPATKUL had for sale: "[l]ooking....both SAY 2007....but weren't put in my safe according to records 2012 earliest. (I have a ton of lasers)[.]"

d.   Also, on September 5, 2023, TANJAPATKUL, using Facebook account Taro Kosit, publicly posted that he was actively conducting business and sending packages. A screenshot of that post is below:

17



**G.    Additional Investigation Regarding the SUBJECT STORAGE UNIT**

30.    As set forth below, evidence seized from TANJAPATKUL shows that he was storing contraband in the SUBJECT STORAGE UNIT leading up to the October 2023 search of his residence. He continues to pay substantial rent for the SUBJECT STORAGE UNIT, including paying as recently as June 2024.

31.    On or about October 6, 2023, Judge Richlin authorized warrants for agents to search the TANJAPATKUL Residence (the "Residence Warrant"), TANJAPATKUL's person (the "Person Warrant"), and TANJAPATKUL's vehicle ("the "Vehicle Warrant") (together, the "October 2023 Warrants"). See 2:23-mj-5174 (C.D. Cal.) (Residence Warrant); 2:23-mj-5178 (C.D. Cal.) (Person Warrant); 2:23-mj-5176 (C.D. Cal.) (Vehicle Warrant).  The October 2023 Warrants authorized agents to search for and seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371, 641, and 2314, i.e., fraud offenses.

32.   On or about October 13, 2023, officers observed
TANJAPATKUL outside of his home, the TANJAPATKUL Residence.
Officers approached him and seized an Apple iPhone 7 Plus
pursuant to the Person Warrant (the "SUBJECT CELLPHONE").
Officers then entered the TANJAPATKUL Residence, located at 3494
Aries Court, Santa Ana, California, and searched it pursuant to
the Residence Warrant.

33.   Based on my review of FBI records, I know that agents
seized evidence of firearms and fraud offenses from the
TANJAPATKUL Residence, including 72 firearms.[4] Three of the
firearms seized from TANJAPATKUL's residence had settings that
allowed them to fire multiple rounds of ammunition with a single
trigger pull, which, based on my review of an FBI report, means
they were machineguns, possessed in violation of 18 U.S.C.
§ 922(o).

34.   After seizing the firearms and other evidence from
TANJAPATKUL's home, I transmitted a list of items to United
States Department of Defense ("DOD") criminal investigators,

---

[4] Based on my communications with other law enforcement officers,
I know that the 72 firearms seized from the TANJAPATKUL
Residence on or about October 13, 2023, were initially seized
into evidence by local law enforcement officers who determined
that TANJAPATKUL was prohibited from possessing the 72 firearms
because they violated California state law regarding the
unregistered possession of firearms. After law enforcement
officers determined that three of the firearms were machineguns,
possessed in violation of federal law, as set forth herein,
those three machineguns were taken into the custody of the FBI.

including but not limited to, the Defense Criminal Investigative Service ("DCIS"). On or about On November 27, 2023, DCIS Special Agent James Moon notified me that at least 71 of the items seized from the TANJAPATKUL Residence on October 13, 2023, were stolen United States Government military property. Specifically, according to Special Agent Moon, these items were originally stolen by Allen. The stolen items seized from the TANJAPATKUL Residence included infrared aiming lasers, weapon lights, weapon sights, thermal sights, night vision, and other accessories.[5]

35.    As set forth above, on or about October 13, 2023, officers seized, among other things, the SUBJECT CELLPHONE. My review of the SUBJECT CELLPHONE has revealed that TANJAPATKUL frequently referenced storing contraband items in the SUBJECT STORAGE UNIT. Specifically, based on my review of the contents of the SUBJECT CELLPHONE, I have learned, among other things, the following:

a.    During an October 5, 2023, conversation, the user of a particular telephone number ending in 7906 sent a picture

---

[5] On or about February 8, 2024, another FBI agent and I interviewed Allen at his home in Louisiana. Allen stated, among other things, that he did not recall the name Arthit TANJAPATKUL or the Facebook account "Taro Kosit." Allen did, however, recall selling to an individual in California (the "California Subject"). Based on my investigation, I believe that TANJAPATKUL resided in California during the period when Allen was stealing and selling military equipment. During my interview with Allen, he stated, in sum and substance, that he and the California Subject never discussed that the gear was stolen. However, Allen believed the California Subject knew the deals were illegal.

of binoculars to the 0306 Phone Number, i.e., TANJAPATKUL. The binoculars were pictured on a Photonis paper. According to www.photonisdefense.com, Photonis is a company who makes night vision products. TANJAPATKUL offered to meet in person and suggested trading for infrared lasers and thermal sights. The two agreed to meet and on October 6, 2023, and TANJAPATKUL, using the 0306 Phone Number, stated "Prob be done close to 4.30 but will likely drop by storage to pick up something. Let me know and we can go from there." Based on my training and experience, I believe TANJAPATKUL's referenced to "drop[ping] by storage to pick something up" meant that he would go to his storage unit ("storage") to retrieve an item ("pick something up").

    b.    During a September 1, 2023, conversation, sunrizes@yahoo.com[6] told the user of a particular phone number ending in 8344, "I'm the guy with the SU 553's." According to www.opticsplanet.com, an Eotech 553 is a holographic night vision compatible weapon sight. Later in the conversation sunrizes@yahoo.com stated "Just went to storage and found 2 SU's I had put aside because of conseq serial numbers." Based on my training and experience, I believe TANJAPATKUL was telling the user of the 8344 telephone number that he had retrieved two

---

[6] During the October 13, 2023, interview, TANJAPATKUL told your affiant that his email address was sunrizes@yahoo.com.

Eotech 533 holographic night vision compatible weapon sights from his storage unit.

   c. During an August 25, 2023 conversation, TANJAPATKUL, using the 0306 Phone Number, told the user of a particular phone number ending in 2778 they would send photographs of CNVDT and UTM. According to www.willsoptics.com, EoTech CNVD-T is a clip on night vision thermal and BAE UTM X is a universal thermal monocular. TANJAPATKUL, using the 0306 Phone Number, then sent a picture of what appears to be a tan scope and stated "Since I was in storage pulled it out." Based on my training and experience, I believe TANJAPATKUL was telling the user of the 2778 telephone number that he retrieved the tan scope from his storage unit.

   d. During a May 29, 2023, conversation, TANJAPATKUL, using the 0306 Phone Number, offered to trade infrared lasers to the user of a particular phone number ending in 0069 in exchange for body armor. TANJAPATKUL, using the 0306 Phone Number, stated "Might be interested in a full set like said for a PEQ… If your game…But I would have to go back to storage to see lol. Easy sell lasers are especially with the quality ones I have." Based on my training and experience, I believe TANJAPATKUL was telling the user of the 0069 phone number that he would have to check his storage unit to see if he had any PEQ laser units – described above as stolen units – for sale. As set forth above,

one of the stolen lasers sold by TANJAPATKUL in 2023 was a LA-5/PEQ laser.

36.   Based on my review of FBI records, I have learned that officers seized several items from the TANJAPATKUL residence, which were then confirmed to be stolen military equipment, that are similar to the items that TANJAPATKUL said he kept in his storage unit, as set forth above. For example, officers seized EoTech model SU-231 weapon sights (not identical SU 533 weapon sights) from the TANJAPATKUL residence that were stolen. Accordingly, I believe the items that TANJAPATKUL is keeping in the SUBJECT STORAGE UNIT may also be stolen and/or regulated by the FDA.

37.   On May 9, 2024, I received credit card statements for Chase account ending in 8651. The account name was Mr Arthit TANJAPATKUL. The following transactions were found:

a.   An April 3, 2024, payment of $483.00 to Public Storage 07102.

b.   A March 3, 2024, payment of $483.00 to Public Storage 07102.

38.   On May 9, 2024, I received credit card statements for Chase number 4147-2025-8882-1759. The account name was Mr Arthit TANJAPATKUL. The following transactions were found:

a.   A February 3, 2024, payment of $371.00 to Public Storage 07102.

b.   A January 3, 2024, payment of $371.00 to Public Storage 07102.

c.   A December 3, 2023, payment of $371.00 to Public Storage 07102.

d.   A November 3, 2023, payment of $371.00 to Public Storage 07102.

e.   An October 3, 2023, payment of $371.00 to Public Storage 07102.

39.   On May 28, 2024, I received records from Public Storage. According to a rental agreement signed by TANJAPATKUL on August 15, 2019, I found that TANJAPATKUL rented Space 2022, a 10x10 storage unit, located at Public Storage, 4501 West MacArthur Boulevard, Santa Ana, California, i.e., the SUBJECT STORAGE UNIT. I also reviewed a customer transaction journal which showed TANJAPATKUL has made consistent monthly payments for Space 2022 since signing the agreement on August 15, 2019. The most recent payment of $483.00 for Space 2022 was received by Public Storage from TANJAPATKUL on June 19, 2024.

40.   Based on my training and experience, individuals who sell prohibited and/or stolen equipment frequently store parts of their contraband supply outside the home, such as in storage units. Furthermore, based on my training and experience, TANJAPATKUL's storage unit, which is 10 feet by 10 feet, is relatively large. The substantial monthly cost of the storage unit, at least $371 per month, supports the conclusion that TANJAPATKUL is using the space at least in part for a commercial purpose, i.e., selling prohibited and/or stolen equipment.

**H.   Additional Investigation Regarding the SUBJECT CELLPHONE**

41.   As set forth above, the SUBJECT CELLPHONE was seized from TANJAPATKUL's person on or about October 13, 2023, pursuant to the Person Warrant.

42.   Based on my review of a law enforcement report prepared by an FBI Special Agent who reviewed the SUBJECT CELLPHONE pursuant to the Person Warrant, I have learned, among other things, the following:

a.   On or about April 8, 2014, TANJAPATKUL, using the SUBJECT CELLPHONE, exchanged text messages with another individual using a phone number ending in 9585 (the "9585 Phone Number"). Tanjpatkul sent a picture of a rifle to the 9585 Phone Number and told that person to look at the switch. The user of the 9585 Phone Number asked if it was full auto (i.e., had fully automatic firing, like a machinegun). TANJAPATKUL stated "funny what you can get on the Internet these days" . . . "Aisroft . . ." The user of the 9585 Phone Number later put "airsoft gun" in quotations. Based on my training and experience, "airsoft" is a reference to a popular type of replica firearm that shoots plastic pellets, rather that genuine ammunition. Based on my training and experience, TANJAPATKUL and the user of the 9585 Phone Number referred to the automatic weapons as "airsoft" guns as a joke or euphemism because the possession and sale of a fully automatic gun (i.e., a machinegun) is unlawful.

b.   TANJAPATKUL sent the 9585 Phone Number a picture of a rifle lower with the selector switch in the fully automatic position. The FBI Special Agent who reviewed the SUBJECT CELLPHONE pursuant to the Person Warrant noted that the picture of this rifle lower matches the AR-type .556 caliber fully automatic rifle with Plumcrazy lower and LWRC International upper which was seized by the FBI from TANJAPATKUL's residence on or about October 13, 2023, pursuant to the Residence Warrant.[7]

c.   The user of the 9585 Phone Number responded to this picture stating the owner was going to have to show them how to build one of the airsoft guns. Based on my training and experience, this is another joking or euphemistic reference to a fully automatic machinegun, as both participants know the possession or sale of a machinegun is unlawful.

43.   Because the Person Warrant authorized law enforcement officers to seize evidence of 18 U.S.C. §§ 371, 641, and 2314, i.e., fraud offenses, it may not have authorized the seizure of the aforementioned evidence regarding TANJAPATKUL's unlawful possession and sale of a machinegun. Accordingly and as set forth in Attachment B-2, I am seeking a proposed warrant that will authorize the search for and seizure of material from the SUBJECT CELLPHONE related to TANJAPATKUL's unlawful possession of machineguns and sale of firearms, in violation of 18 U.S.C. §§ 922(o) and 933.

---

[7] Based on my training and experience, I believe that TANJAPATKUL's knowing reference to possessing a machinegun in 2014, which was seized from his home in 2023, shows that he has long-known that he possessed an illegal machinegun.

### I.   Additional Investigation Regarding the SUBJECT HARD DRIVE

30.  On or about October 13, 2023, while executing the Residence Warrant at TANJAPATKUL's home in Santa Anta, California, agents seized the SUBJECT HARD DRIVE. Based on my review of FBI search records, I have learned the SUBJECT HARD DRIVE was found in a black bag in the attic.[8]

31.  Based on my communications with other law enforcement officers, I have learned, among other things, the following:

a.   On April 25, 2024, while reviewing the SUBJECT HARD DRIVE pursuant to the October 2023 Warrants, FBI Special Agent Jennifer Hirsch observed video thumbnails which she stated clearly depicted child pornographic material.[9]

---

[8] Under the terms of October 2023 Warrants, agents could review evidence seized TANJAPATKUL's residence for 120 days from the date of executing the warrant, i.e., until February 10, 2024. On or about February 12, 2023, the Honorable Patricia Donahue, United States Magistrate Judge, authorized agents to continue to search various digital devices seized pursuant to the October 2023 Warrants, including the SUBJECT CELLPHONE and the SUBJECT HARD DRIVE, for an additional period of 120 days, i.e., until June 9, 2024. On or about June 7, 2024, the Honorable Karen Stevenson, United States Magistrate Judge, authorized agents to continue to search various digital devices, including the SUBJECT CELLPHONE, for an additional period of 120 days, i.e., until October 7, 2024. However, because the search of the SUBJECT HARD DRIVE for evidence of the Subject Fraud Offenses had been complete, the government did not seek and Judge Stevenson did not enter an order extending the time to review the SUBJECT HARD DRIVE.

[9] Special Agent Hirsh is not an agent specializing in child sexual abuse material, including child pornography. However, for the reasons set forth herein, such as the file names for pornographic material referencing youthful ages, I believe the materials she observed constitutes unlawful child pornography.

    b.   Special Agent Hirsch did not open the video files and was uncertain of the exact content; however, there were over 40 video thumbnail arrays which all appeared to have minor females.

    c.   The names/titles of many of these video had similar naming conventions, which included "Young Video Models" or "YVM" with a name, age and additional descriptors (ex. "Young Video Models – D05n – Daphne 9yo (60m, nude, dad))(youngvideomodels yvm).avi"). The labeled age ranges appeared to include females 7 years old to 15 years old.

    d.   One such video thumbnail array depicted a nude Caucasian female which appeared to be approximately 12 years old. The face of the young girl was visible and she was depicted in various positions, including sitting on the ground with her legs up in the air, exposing her vagina. The video file was titled "yvm_Irina # 5 Nude 12y).avi" The creation date was listed as 7/4/2008 and the date modified was listed as 7/14/2008. Based on my training and experience, the phrase "Irina # 5 12y" means that the woman in the video had the name or pseudonym "Irina" and she was 12 years old ("12y").

    e.   Another video thumbnail array depicted a nude Caucasian female which appeared to be approximately 7 years old. The face of the young girl was visible and she was depicted in various positions, including sitting on the ground with her legs

spread open to display her vagina. In another thumbnail, the girl was depicted bending forward, exposing her anus and vagina. The video file was titled "Young Video Models – Kr04 – Kristina 7yo (60m, topless) (youngvideomodels yvm).avi". Based on my training and experience, the phrase "Kristina 7yo" means that the woman in the video had the name or pseudonym "Kristina" and she was 7 years old ("7yo"). The creation date was listed as 6/20/2008 and the date modified was listed as 7/8/2008.

      f.    Another video thumbnail array depicted a nude Caucasian female, which appeared to be approximately 9 years old. The face of the young girl was visible and she was depicted in various positions, including laying on her side. The girl's vagina was exposed and it appeared that a white object was being inserted into her vagina. Later in the thumbnail array, there appeared to be a nude Caucasian adult male laying on his back. In various thumbnails of the same video, various sexual acts were depicted, including the young girl touching the adult male's penis, the young girl sitting on the adult male's torso and an adult hand touching the young girl's vagina. The video file was titled "Young Video Models – D05n – Daphne 9yo (60m, nude, dad)(youngvideomodels yvm).avi". The creation date was listed as 7/4/2008 and the date modified was listed as 7/9/2008. Based on my training and experience, the phrase "Daphne 9yo"

means that the woman in the video had the name or pseudonym "Daphne" and she was 9 years old ("9yo").

g.    There were numerous other video thumbnail arrays of females that had youthful appearance, many of which appeared to be exposing their vaginas and anuses and touching their vaginas.

32.  For the reasons set forth above, I believe the SUBJECT HARD DRIVE contains evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography) and 18 U.S.C. § 2252A(a)(2) (Receipt and Distribution of Child Pornography).[10]

## V.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally,

---

[10] Law enforcement officers previously generated an electronic forensic copy of the SUBJECT HARD DRIVE. Accordingly, the proposed warrant to search that device expressly provides that officers may search the SUBJECT HARD DRIVE or electronic forensic copies of the same device. See Attachment B-3 ¶ 4(b) ("In searching the contents of the SUBJECT HARD DRIVE, law enforcement officers may search previously generated electronic forensic copies of the same device.")

when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time. Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

   b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

   c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and

31

who used it. For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions. Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed. Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    34.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

       a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction. Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above. Also, there are now so
many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VI.   CONCLUSION

23.   For all the reasons described above, there is probable cause to believe that the items listed in Attachments B-1, B-2, and B-3 which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, will be found in the SUBJECT STORAGE UNIT, on the SUBJECT CELLPHONE, on the SUBJECT HARD DRIVE, as described in Attachments A-1, A-2, and A-3.


_____
DANIEL DALES
Special Agent
Federal Bureau of Investigation


Sworn to before me on
this ___ day of July, 2024.


_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE